Jose A. Abarca (12762)
Romaine C. Marshall (9654)
POLSINELLI PC
2825 E. Cottonwood Parkway, Suite 500
Salt Lake City, UT  84121
(801) 999-3503
jabarca@polsinelli.com
rmarshall@polsinelli.com

John R. Neve (*pro hac vice* forthcoming)
John Hayden (*pro hac vice* forthcoming)
QUANTUM LEX PA
6800 France Ave S, Suite 405
Minneapolis, MN  55435
(952) 746-2400

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DAVID WYLY and USELESS CRYPTO, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>LUCKY DOG HOLDING LTD.; BONK, INC.; BONK LIVE LTD.; MITCHELL RUDY; and JOHN DOES 1–10,<br><br>    Defendants. | **COMPLAINT**<br><br>Case No. 2:26-cv-361<br>Judge _____ |

## INTRODUCTION AND NATURE OF THE ACTION

1.      This case arises from Defendants' unauthorized use of Plaintiffs' USELESS

trademark and logo to launch and promote a competing cryptocurrency token. To assist the Court

in understanding the technology and market structure relevant to this dispute, Plaintiffs provide

an explanation of commonly used cryptocurrency terms in the attached Exhibit A.

2.      As will be explained in more detail below, David Wyly got involved with USELESS in May 2021. He commissioned the Logo Artwork in late May 2021 and registered Useless Crypto, LLC with the State of Utah in June 2021.

3.      The Logo Artwork is:

4.      The artist who created the artwork transferred the copyright to David Wyly.Plaintiffs' use of the USELESS mark and stylized "U" logo commenced no later than May 29, 2021, when Plaintiff David Wyly received and began publicly using the logo in connection with the Useless cryptocurrency project. Since that time, Plaintiffs have continuously used the USELESS name and logo in commerce in connection with cryptocurrency tokens, software applications, online platforms, and merchandise offered to consumers in the United States and globally. The mark and logo have been prominently displayed across websites, social media, exchange listings, and applications, identifying Plaintiffs as the source of the associated goods and services and establishing Plaintiffs' common law trademark rights.

5.      On May 10, 2025, one or more individuals deployed a cryptocurrency token using the name "USELESS" and the stylized "U" logo associated with Plaintiffs' long-standing project. The token was launched on the Solana blockchain through the LetsBONK.fun platform, which, upon information and belief, is controlled by the named Defendants. Plaintiffs did not authorize this launch and had no involvement in it.

6.      The logo Defendants used for their token was:

7.      Shortly after deployment, the token was promoted across social media as a supposed "community takeover" of the original USELESS project. That narrative suggested that members of the cryptocurrency community had revived an abandoned project.

2

8. That narrative was false.

9. The original USELESS project had not been abandoned. Plaintiffs continued to maintain the USELESS brand and associated intellectual property while developing products and infrastructure connected to the ecosystem.

10. Despite that fact, Defendants and their affiliates promoted the newly launched token using Plaintiffs' name, logo, and brand identity. Promotional materials, domain names, and social media messaging created the false impression that the new token was connected to Plaintiffs or represented a continuation of the original USELESS project.

11. The promotion generated rapid public interest and significant trading activity.

12. At the same time, blockchain data shows that wallets associated with insiders accumulated large quantities of the infringing token shortly after its launch. These acquisitions occurred before widespread public awareness of the project.

13. Following the coordinated promotion campaign, the price and trading volume of the token increased dramatically. Insider wallets then sold substantial portions of their holdings at significant profit.

14. The launch also generated large amounts of transaction activity on the Raydium decentralized exchange platform, which enriched Defendants through trading fees. LetsBONK.fun is a token launch protocol within the BONK ecosystem that enables the rapid deployment and trading of new tokens. Once the token is launched, trading is migrated to a third party decentralized exchange. In this case, that platform is Raydium. Each transaction executed through the Raydium platform generates fees that are routed to wallets associated with the

BONK ecosystem. Trading fees arising from the infringing token generated tens of millions of dollars for Defendants.

15.     As a result, the trading activity surrounding the infringing token produced revenue both for insider traders and for the platform that facilitated the launch.

16.     Defendants' conduct damaged Plaintiffs twice. Not only did it divert value from Plaintiffs' project and cause confusion among consumers who believed the infringing token was associated with Plaintiffs, Defendants' misuse of Plaintiffs' branding also damaged the reputation and goodwill Plaintiffs had built in the USELESS name.

17.     Plaintiffs bring this action to stop Defendants' ongoing infringement and to recover damages and equitable relief, including the disgorgement of profits obtained through Defendants' use of Plaintiffs' intellectual property.

## **THE PARTIES**

18.     Plaintiff David Wyly is the Utah-based founder and rights-holder of the "USELESS" brand. Wyly is a Utah native who has invested substantial personal capital and creative effort into building the Useless ecosystem since its inception in May 2021. He commissioned the Logo Artwork and has been designated as the litigation representative by the Useless DAO.

19.     Plaintiff Useless Crypto, LLC is the Utah-based operational arm of the Useless ecosystem. Registered as a Utah limited liability company, Useless Crypto, LLC manages cryptocurrency projects and distributes digital products and services globally. It serves as the entity responsible for holding intellectual property and performing commercial functions on behalf of the Useless DAO.

4

20.     Defendant Lucky Dog Holding Ltd. is a Cayman Islands foundation that directs the infringing enterprise. Lucky Dog is an exempted company that operates a suite of decentralized finance protocols on the Solana blockchain. Lucky Dog and its core contributors transact business impacting this District, and the entity siphoned millions in trading fees from the infringing token to inflate the price of its platform token, $BONK.

21.     Defendant Bonk Live, Ltd., is a British Virgin Islands corporation with its principal place of business at PO Box 3159, Road Town, 3159, British Virgin Islands. This entity has filed in opposition to Plaintiff's federal trademark application, and purports to operate a cryptocurrency token launch platform facilitating blockchain based token deployment and related services. The precise relationship between Defendant entities, and allocation of activities is not precisely known.

22.     Defendant Bonk, Inc. is a Delaware corporation that profited and continues to profit directly from the unauthorized token launch. Bonk, Inc. maintains its principal place of business in Jupiter, Florida. The company holds a revenue-sharing interest in the LetsBONK.fun platform used to deploy the infringing token and maintains substantial ties to the BONK Team[1] through shared board appointments.

23.     Defendant Mitchell Rudy is a central coordinator of the infringing scheme. Rudy is a Florida resident and a founding contributor to the BONK ecosystem. Serving on the board of Defendant Bonk, Inc., Rudy functioned as a "central coordination node" across a network of insider wallets used to accumulate the infringing token and extract value at Plaintiffs' expense.

---

[1] Aside from leadership, the BONK Team is intentionally secretive about its membership.

24.     Defendants John Does 1–50 are a coordinated network of conspirators who executed the misappropriation. These currently unidentified individuals and entities assisted in the launch, promotion, and manipulation of the infringing token. They include "alpha group" leaders and paid influencers who manufactured the false "community takeover" narrative to deceive the public while securing personal gains through pre-loaded wallets.

(1)     John Doe 1, designated the 'Copycat Deployer,' is the anonymous individual who deployed the infringing $USELESS token on the Solana blockchain on May 10, 2025, using the LetsBONK.fun launchpad under contract address Dz9mQ9NzkBcCsuGPFJ3r1bS4wgqKMHBPiVuniW8Mbonk. Forensic blockchain analysis has attributed the primary deployer wallet (C-1) to this individual, with the deployment transaction traced to a Bybit-linked address. Upon information and belief, the Copycat Deployer is associated with the pseudonymous identities tiltedtowers.sol and doublepump.sol, and connected to the social media accounts @iboughtdips, @NachSOL, and @andy8052. The deployer wallet C-1 processed over 195 trillion $USELESS tokens across 363 transactions, and the Copycat Deployer's network includes wallet C-3, attributed to andy8052, which forensic analysis determined to share operational characteristics with the known KOL @printgod_. The infringing launch replicated Plaintiff's exact brand name, stylized 'U' Logo Artwork, color scheme, and promotional domain, causing consumer confusion and irreparable harm to Plaintiff's established trademark and copyright interests.

(2)     John Doe 2 is Unipcs, also known as 'The Bonk Guy' and operating as @theunipcs, is a key opinion leader with over 228,000 X followers who tweeted about the infringing $USELESS token on the day of its launch, purchased it through a concealed side

6

wallet more than four hours before his publicly known wallet made its first purchase, and then conducted a months-long campaign of promotional tweets that broadly disseminated plaintiff David Wyly's copyrighted and trademarked material to his audience. On-chain evidence establishes that Unipcs accumulated at least 14,972,478 tokens through concealed side-wallets between May 10 and June 5, 2025, in addition to 28,080,154 tokens held in his public wallet, while upon information and belief also pledging millions of dollars' worth of infringing $USELESS as collateral on sendit.fun without public disclosure. Unipcs maintained direct coordination with LetsBONK.fun lead developer @SolportTom and co-defendant Lexapro, contributed approximately $550,000 worth of infringing $USELESS to the LetsBONK.fun treasury, and continued to promote the infringing token even after being expressly informed of the infringement. The on-chain wallet cluster attributed to Unipcs spans at least nine identified Solana addresses and multiple EVM addresses, connected by cross-chain bridges, exchange deposit addresses, and direct funding relationships that collectively evidence deliberate obfuscation of his financial exposure to the infringing token.

(3)     John Doe 3 is SolportTom (@SolportTom), a key opinion leader with over 210,000 followers on X and the lead developer of the LetsBONK.fun platform, actively promoted, purchased, and financially supported the infringing $USELESS token beginning on the day of its launch, May 11, 2025. SolportTom's attributed wallet S-8 (SolportTom #129), funded by his primary wallet S-2 (SolportTom #100), executed the earliest documented purchase of infringing $USELESS no later than 18:47:37 on May 11, 2025, and later received $334,379.64 worth of infringing $USELESS from the Useless Treasury multisig. SolportTom subsequently made numerous public admissions of personal and corporate investment in

$USELESS — including a personal purchase of 1,000 SOL worth of $USELESS, corporate expenditures exceeding $1 million on exchange listings, and operation of a buyback program generating approximately $3,000 per day — while simultaneously using his platform role to drive promotional activity coordinated with co-defendants Kadense and Unipcs. SolportTom publicly disclosed a $639,107 donation wallet and a $237,021 donation treasury, both dedicated to supporting $USELESS exchange listings, further cementing his financial entanglement with and promotional role in the infringing token.

(4)     John Doe 4 is Lexapro (X handle @LexaproTrader), a prominent crypto key opinion leader and self-described 'main guy' for the infringing $USELESS token who purchased the token approximately one minute after its launch on May 10, 2025, and continued acquiring it across at least ten attributed Solana wallets through May 18, 2025. Lexapro publicly promoted $USELESS to his audience from launch onward, calling it a potential '500 mil plus play,' coordinating with co-defendants including Unipcs (Bonk Guy) and Kadense, and has publicly admitted to his central promotional role while spending over 100,000 dollars of his own money promoting tokens including $USELESS. Forensic blockchain analysis identified Lexapro's wallets among a cluster of KOL wallets that acquired substantial $USELESS positions within the first 24 hours of deployment, consistent with access to pre-launch information. Lexapro has also publicly acknowledged awareness of intellectual property claims against the $USELESS project and asserted a personal role in its creative direction, directly implicating him in the trademark infringement at issue.

(5)     John Doe 5 is Marcell, operating publicly as @MarcellxMarcell, a key opinion leader and promoter who used a network of at least 30 attributed Solana wallets to accumulate,

trade, and profit from the infringing $USELESS token across a period spanning from May 10, 2025 through at least January 2026. Wallets M-1 (his publicly known KOL address) and M-9 (his primary side wallet) served as the hub of a distribution architecture through which proceeds were aggregated, with M-9 receiving at least 11 transfers individually valued between $60,000 and $216,000 from attributed wallets. Two stealth wallets — M-1 (labeled 'Marcell #4') and M-25 (labeled 'Marcell #19') — purchased infringing $USELESS tokens on May 10, 2025, before co-defendant Unipcs made his public purchase, establishing that Marcell had advance knowledge of the token's launch. Across multiple satellite wallets, Marcell's on-chain activity reflects estimated profits in excess of $3.3 million from sales of the infringing $USELESS token, with individual liquidation events as large as $1,577,779 from a single wallet.

(6)     John Doe 6 is Gloom, known publicly as @gloom_hl and @gloom_sol, an individual affiliated with the BONK ecosystem who held himself out as both General Counsel and personal attorney to Mitchell Rudy. Gloom served as a key financial coordinator in the $USELESS token scheme, directing funds from the BONK treasury to influencers and promoters of the infringing token and contributing at least $10,000 directly to the Useless Treasury multisig wallet. Gloom was also an early acquirer of the infringing $USELESS token, with his attributed wallet G-2 executing 45 transactions involving over 16 million tokens no later than May 10, 2025, and a connected wallet holding $USELESS tokens valued at approximately $1.8 million. Gloom controls a cluster of at least nine attributed Solana wallets linked by Solana Name Service domains, on-chain funding relationships, and NFT marketplace profiles, several of which received or transmitted funds associated with the infringing token.

9

(7)     John Doe 7 goes by Linus Caldwell, operating as @LinusCaldwell5 on X with 7.9k+ followers, is a promoter of the infringing $USELESS token and a 'Member 2' signer of the 'Useless Treasury' multisignature wallet, placing him in a direct leadership role in the conspiracy. Across at least 19 attributed Solana wallets, Caldwell accumulated and transferred tens of millions of infringing $USELESS tokens, with his largest attributed wallet (L-11) holding 28,166,848 tokens worth approximately $3.2 million as of November 17, 2025. Caldwell funded and directed the Useless Treasury multisig, contributing infringing tokens from multiple wallets, receiving $92,500 in $USDT disbursements from that same treasury, and making payments to co-defendants Marcell and Rachel Wolchin from attributed wallets. His purchase activity through multiple wallets began within four days of the token's launch — and in one instance before the token's public promotion commenced — evidencing pre-launch access. Caldwell's Alphaverse NFT cluster, linked to his public claims of partnership at @Alphaverse and @Alphaverse_NFT, provides additional on-chain corroboration connecting his attributed wallets into a unified controlled network.

(8)     John Doe 8 is Kadense (X: @iamkadense), also known as Kadense Pengu, a core contributor and community growth lead for the Bonkfun (LetsBONK.fun) platform who holds at least thirteen attributed Solana wallets, including his primary identity wallet K-8 (kadense.sol). Plaintiff's evidence establishes that Kadense publicly promoted the infringing $USELESS token on the day of its launch, held a position in $USELESS, and continued amplifying the token to his 75,000+ followers across multiple subsequent tweets. An independent forensic network analysis identified Kadense as a central coordination node connecting multiple wallet clusters with ties to the Bonk project. Kadense's on-chain activity, public admissions of holding $USELESS, and

10

documented coordination with co-defendants SolportTom and Unipcs establish his knowing participation in the promotion and commercialization of the infringing mark.

(9)     John Doe 9 is Koyla (@koyla_sol), a Bonk-affiliated insider who purchased the infringing $USELESS token across multiple attributed wallets approximately three hours before the token's public promoter, Unipcs, made his own purchase — a timing pattern consistent with advance knowledge of the token's launch. Operating at least eleven attributed Solana wallets (K-1 through K-11) with self-identifying Solana Name Service domains including koy.sol, koyla.sol, and koylaburner.sol, Koyla accumulated, redistributed, and ultimately liquidated substantial $USELESS holdings, at one point claiming to hold over $1 million in the infringing token. On-chain records show Koyla's wallet cluster transferred $USELESS tokens to co-defendants Mitchell Rudy (Nom) and, upon information and belief, to @cryptogle of World Liberty Financial (WLFI) on the day of launch, evidencing coordinated distribution of the infringing mark. The Xchainge forensic report independently identifies @koyla_sol as a central coordination node connecting multiple wallet clusters affiliated with the Bonk project, and Koyla's Bybit-exit wallet (K-11) received a combined $1,426,834 in USDC proceeds flowing from three of his $USELESS wallets.

(10)     John Doe 10 is UselessChad (a/k/a UselessIntern, @uselesschad), a self-identified promoter, community organizer, and self-styled 'CTO' of the $SSX (Solana Stock Index) project who became one of the most publicly active boosters of the infringing $USELESS token before pivoting to lead the $SSX community. Plaintiff has attributed at least 19 Solana wallets to UselessChad across multiple attribution sources, including UselessChad's own public posts, third-party community posts, and on-chain forensic analysis. UselessChad coordinated directly

with other named defendants — including @LexaproTrader, @SolportTom, and @theunipcs — to drive awareness and trading activity in $USELESS, and publicly announced his intention to rotate realized $USELESS profits into $SSX, linking his $USELESS promotional conduct to his subsequent leadership role in that project. A third-party forensic post attributed wallet U-2 to UselessChad and alleged that it sold more than $500,000 worth of $USELESS tokens, and UselessChad's wallet U-10 executed 49 transactions involving 2,619,309 tokens between May 12 and June 9, 2025.

## JURISDICTION AND VENUE

25.     This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) over the federal claims arising under the Trademark Act of 1946 (a/k/a the Lanham Act), the Anticybersquatting Consumer Protection Act (ACPA), and supplemental jurisdiction under 28 U.S.C. § 1367 over the state claims.

26.     This Court has personal jurisdiction over Defendants because the harm is felt in this District, where Plaintiffs are registered and based. Defendants transact business nationwide, including in Utah, through digital platforms directed to and accessible by Utah residents, and therefore have sufficient minimum contacts with this District.

27.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, and substantial harm occurred here.

## FACTUAL BACKGROUND

### A.     FOUNDING AND DEVELOPMENT OF THE ORIGINAL USELESS

28.     In May 2021, Utah resident David Wyly joined the early community of a newly launched cryptocurrency token known as "$USELESS" on the Binance Smart Chain.

12

29.     Within four days, the anonymous developer transferred full ownership and control of the project to Mr. Wyly and the community he represented. This transfer occurred through direct communications in the project's official channels, including Discord, where the developer coordinated with community leadership to effectuate a "community takeover." As part of that process, the developer provided access credentials to the deployer wallet controlling the token's smart contract, transferred control of project infrastructure including the *uselesstoken.org* domain, and relinquished all administrative authority over the project's digital assets and communications channels. These actions were publicly acknowledged within the community and recognized by participants as a complete handoff of the project and ownership of assets.

30.     On May 29, 2021, Mr. Wyly commissioned and received the now-iconic stylized "U" logo (the "Logo Artwork"), which became the visual identity of the USELESS brand.

31.     Pursuant to Fiverr's terms of service, the copyright transferred from the artist to Wyly upon payment. This would later be reconfirmed when a certain Doe Defendant threatened the artist to release the copyright to them instead.

32.     In June 2021, Wyly registered Useless Crypto, LLC with the Utah Secretary of State to serve as the project's operating entity.

33.     On June 9, 2021, Wyly launched a new version of the USELESS smart contract (v2) to address liquidity concerns.

34.     This launch was accompanied by a broader commercial rollout, including branded merchandise, collectibles, and centralized exchange listings.

13

35.    The project began getting national recognition, with Vice publishing an article in July 2021.[2]

36.    Plaintiffs kept building. In August 2021, they launched a beta self-custody wallet named Useless Crypto for community members and holders to store their tokens. This app would eventually have over 5,000 users.

37.    Plaintiffs auctioned commemorative coins in the same month.

38.    The project reached a peak market capitalization of over $50 million and garnered recognition within the decentralized finance space for innovation and community governance.

39.    The logo began to be displayed in third party apps such as Trust Wallet, a wallet app trusted by 200 million people, and was listed on more centralized exchanges which prominently featured the logo, including Probit.

40.    In September 2021, through products, promotion, and community and individual efforts, the Useless token exceeded a $50M market capitalization.

---

[2]  https://www.vice.com/en/article/useless-token-is-the-latest-wild-scheme-promising-crypto-riches/  (last accessed 4/27/2026).



41.     More centralized exchange listings followed.

42.     In February 2022, the wallet app Useless Crypto was renamed "All for One (Powered by Useless Crypto)." A venture capitalist behind the app wanted to distance themselves from an explicitly memecoin name, but the "Powered by Useless Crypto" and inclusion of the Useless Logo across the application tipped a cap to the growing product and marketing force that Useless Crypto had become.

15



43.      In March 2022, Plaintiffs' efforts drew attention in Wyly's home state in a Utah

Business article.[3] Wyly's pride in the product was evident in the article. He had quit his job by

this point to commit full time to the products and community. He is quoted:

> "What we're trying to do with our all-for-one Useless app is make it easy for people
> like your grandmother, or your aunt, or your parent, or whatever, to get into crypto,
> and to kind of bash down a lot of those barriers, and do it in a way that is fully
> decentralized, or as decentralized as possible…Even though Coinbase or Binance
> may provide some of that accessibility, it's all very centralized, and so this is all in
> the spirit of decentralization, that we're trying to do this in."

44.      Plaintiffs prioritized ease of use, while also promoting consumer protection

through an innovative scoring system that steered new users away from scam tokens.

45.      Wyly himself would become integral to taking down one of crypto's biggest scam

projects: $safemoon. It has always been a cause dear to his heart.

---

[3]   https://www.utahbusiness.com/archive/2022/03/22/useless-crypto-doesnt-want-to-be-a-meme-coin-anymore/ (last
accessed 3/19/2026).

46.    In June 2022, in recognition of his efforts to build safe and innovative products and drive out scammers, Wyly was appointed by Utah Governor Spencer Cox to Utah's Blockchain and Digital Innovation Task Force.

47.    In August 2022, Wyly formed the Useless DAO to formalize community governance, with Useless Crypto, LLC continuing as the operations arm.

48.    In that same month, the All for One (Powered by Useless Crypto) wallet app beta surpassed 5,700 users.

49.    In March 2023, due to regulatory concerns surrounding meme coins, the DAO temporarily rebranded the project to "Eclipse" as a legal risk mitigation measure. Wyly, now a prominent public figure, was always committed to navigating the complex legal landscape of crypto with integrity and good faith compliance. In this climate, the DAO, under Wyly's leadership, opted to shelve the meme branding for their product and community. This change was never intended to mark a permanent departure from the USELESS brand.

50.    At all times, Plaintiff retained ownership and control of the Useless brand and associated intellectual property. Throughout the Eclipse transition, Plaintiff and its community engaged in active internal discussions, published DAO proposals, and preserved the USELESS brand through domain licensing, social media maintenance, and forward-facing communications.

51.    In November 2024, the DAO began drafting a proposal to officially return to the USELESS brand.

52.    The DAO officially returned to the Useless name in July 2025.

**B.    THE INFRINGING TOKEN LAUNCH**

53.    On May 10, 2025, an individual deployed a cryptocurrency token named "USELESS" on the Solana blockchain via the LetsBONK.fun launchpad [the "Infringing Useless"]. As noted above, the Infringing Useless used Plaintiff's exact brand name and the stylized "U" Logo Artwork.

54.    The launch was carried out without Plaintiff's authorization or knowledge. Branding elements associated with Plaintiff—including its name, color scheme, and exact Logo Artwork—were replicated to create the false impression that the new token was an official continuation or revival of Plaintiff's ecosystem. Promotional materials and domain names such as "theuselesscoin.com" reinforced this deception.

55.    The launch was soon framed on social media as a community-led "takeover" of a supposedly abandoned project—commonly referred to as a CTO—a tactic sometimes seen in decentralized crypto communities.

56.    In reality, the launch bore numerous hallmarks of insider manipulation. Wallets known for speculative token flipping were pre-loaded ahead of the public sale and capitalized on launch-day volatility to extract substantial profits. These transactions suggested coordination and foreknowledge inconsistent with a grassroots effort.

57.    Meanwhile, as the Infringing Useless began to soar, a person identifying as "Elliot Higgins" attempted—after the launch—to purchase the copyright to the Logo Artwork from its original creator for a nominal amount, without disclosing its unauthorized use, further evidencing that the infringement was willful and in bad faith.

18

58. The Infringing Useless rapidly gained traction due to a coordinated media narrative and social media blitz, falsely suggesting it was an organic revival of the original USELESS project. The truth—that this was a deceptive commercial exploitation of Plaintiffs' brand identity—emerged through forensic analysis.

59. Defendant Lucky Dog boasted a $750,000 investment into the Infringing Useless, as if it had not been part of the coordinated effort up to that point.



## C.    MR. WYLY MADE EXTENSIVE EFFORTS TO PROTECT OR OTHERWISE RESOLVE THE ISSUE

60. Upon learning of the Infringing Useless, Mr. Wyly filed for state and federal trademarks. His federal application was filed July 17, 2025, and is pending as of the filing of this complaint. His Utah state trademarks were active as of August 13, 2025. (Filings 14242648-0190 and 14242650-0190.)

61. The DAO moved to establish the token in the Solana ecosystem, but it was too late. On July 30, 2025, Plaintiffs launched a Solana version of the original Useless. The announcement for the launch stated: "This expansion to Solana reinforces our commitment to our community and our brand, while also serving as a gentle reminder to copycats that we've started dialing some lawyers…"

62. Unfortunately, the Infringing Useless had already sucked up all the oxygen on the Solana network. Centralized exchanges would not recognize Wyly's token, as the Infringing

Useless had exploded in market cap and Defendants worked in a coordinated and well-connected effort to establish market dominance.

63.     Mr. Wyly worked tirelessly to raise the alarm bells about the Infringing Useless. The logo he commissioned and the brand he had quit his previous job to build was under attack.

64.     The initial difficulty he faced was pinning down who exactly was behind the Infringing Useless. It appeared at first that a scammer had simply tried to copy everything for a quick pump and dump and that the CTO influencers were simply picking up the scammer's abandoned attempt. Wyly contacted influencers directly and through X, trying to draw attention to the fact that the CTO had directly ripped off Plaintiffs' project.

65.     Defendants, being decentralized and anonymous, made it incredibly difficult for him to notify an entity to cease the infringement.

66.     Even so, Defendants clearly got the message. Although they maintained their anonymity, certain individuals reached out to help resolve the dispute. For example, Elliot, who would later threaten the Fiverr artist with legal action if the artist did not transfer the copyright to Elliot, contacted Mr. Wyly on Discord.

67.     To remove any doubt, Mr. Wyly confirmed the transfer once again in writing.



68.    Eventually, Defendants switched the logo on their social media account to another white "U" with yellow background. The logo was even changed on the LetsBONK.fun site, something that has never been done before.

# BEFORE:



# AFTER:



**D.      THE BONK-ORCHESTRATED LAUNCH OF THE INFRINGING USELESS**

69.      The Useless DAO formally appointed Mr. Wyly to lead enforcement efforts on its behalf. In that capacity, Mr. Wyly retained Xchainge, a premier blockchain forensics firm, to investigate whether the launch of the Infringing Useless was, as publicly claimed, a CTO, or in fact a coordinated campaign by insiders linked to the BONK ecosystem.

70.      The forensic evidence is clear. Xchainge's investigation, using advanced clustering algorithms, cross-chain tracing, and network-mapping tools, confirmed that the May 10, 2025 launch was not spontaneous, decentralized, or community-driven. Rather, it was a calculated and carefully orchestrated deployment, executed through pre-loaded wallets, synchronized insider trading, and launchpad infrastructure controlled by or affiliated with BONK.

71.      Key BONK figures—including Defendant Mitchell Rudy (@theonlynom), his personal attorney @gloom_hl, and public-facing influencers like @koyla_sol, @LexaproTrader, and @theunipcs—accumulated large quantities of the Infringing Useless within hours of its launch. Their wallets show early coordinated activity, high-volume transfers, and repeated interactions with the LetsBONK platform. Notably, the wallet tied to @theonlynom functioned as a central node connecting multiple insider accounts.

72.      Contrary to the public-facing narrative, individuals promoted as the leaders of a "community takeover"—such as @BrodieCapital—had no involvement in the launch and received no early token allocations. This mismatch between narrative and on-chain behavior confirms the CTO story was a façade.

73.    Further undermining claims of spontaneity, several of the launch wallets were funded via centralized exchanges—including Bybit, KuCoin, and Coinbase—shortly before deployment. These funding patterns point to a deliberate and concealed operational infrastructure inconsistent with any organic movement.

74.    In short, Defendants misappropriated Plaintiff's brand, masked their involvement behind a false community takeover narrative, and manipulated token distribution to enrich themselves and boost BONK's broader ecosystem—all at the direct expense of Plaintiffs' goodwill, market reputation, and community trust.

**E.    DEFENDANTS PROFITED MASSIVELY FROM THE INFRINGING USELESS THROUGH INSIDER SALES, TRADING FEES, AND REVENUE-SHARING**

75.    The financial incentives behind the infringing $USELESS launch were neither incidental nor attenuated. They were central. BONK-affiliated individuals and entities, including Defendant Bonk, Inc. (formerly Safety Shot, Inc.), derived millions of dollars in profits through coordinated insider trading, trading fees, and post-launch revenue-sharing tied directly to the Infringing Useless's success.

76.    As detailed in the forensic report prepared by Xchainge, wallets associated with known BONK insiders—including @theonlynom, @gloom_hl, @LexaproTrader, and @theunipcs—acquired large quantities of the Infringing Useless within hours of launch. These early acquisitions were followed by timed public endorsements and social media promotions that inflated the token's price. On-chain data confirms that many of these same wallets subsequently offloaded their holdings for massive gains, realizing individual profits in the seven- and eight-figure range. Collectively, BONK-affiliated insiders extracted tens of millions of dollars from the market through these early trades.

77.    The infringing token was launched via LetsBONK.fun—a platform developed and operated by the BONK team in partnership with Raydium, Solana's largest decentralized exchange. Every trade executed through this infrastructure generated fees. A portion of Raydium's trading and launch fees were routed to LetsBONK's revenue wallet, YvWXoyyRpD5fPVZHZV6SY8NS1nuTFmyewxudD3mwuE3, which automatically converted earned SOL into BONK tokens. As the highest-volume token ever launched through LetsBONK, $USELESS generated an estimated **over $25 million in fees** during just the three months following its launch. These funds were used in part to buy back BONK, elevate BONK's market capitalization, and reward BONK insiders through token redistributions and liquidity incentives.

78.    Shortly after $USELESS went viral and reached a market cap exceeding $400 million, Defendant Bonk, Inc.—a Delaware entity formerly known as Safety Shot, Inc.—entered into a revenue-sharing arrangement entitling it to 10% of LetsBONK's gross revenue. This agreement, struck in direct response to the platform's surge in profitability tied to the infringing token, formalized Bonk, Inc.'s financial stake in the ongoing monetization of the counterfeit $USELESS.

79.    This financial structure reveals the depth of BONK's entanglement in the infringing scheme. Far from being a passive or neutral platform, LetsBONK operates as a profit engine for the BONK ecosystem and its key players. BONK insiders did not merely tolerate the misuse of Plaintiffs' brand—they orchestrated it, promoted it, and profited from it at scale.

**F.    DEFENDANTS COORDINATED IN PRIVATE TELEGRAM CHANNELS, FORMING A DE FACTO PARTNERSHIP TO PROMOTE AND PROFIT FROM THE INFRINGING LAUNCH**

80.    In furtherance of their scheme, Defendants—including known BONK insiders and purported "CTO" team members—coordinated promotional, financial, and public messaging strategies for the Infringing Useless via now-deleted private Telegram groups and invite-only Discord servers. These communications reveal a deliberate and sustained effort to plan, execute, and promote the token's launch using Plaintiffs' branding while controlling key marketing narratives.

81.    Upon information and belief, these chats served as operational hubs where Defendants agreed on who would post and when, how to message around the launch, and how to suppress questions about intellectual property theft. Through these joint efforts—including pooling tokens, cross-promoting each other's posts, executing coordinated buys and sells, and sharing treasury wallets—Defendants functioned as a de facto general partnership, each acting in furtherance of the shared goal to inflate the Infringing Useless and profit at Plaintiff's expense.

82.    The John Doe Defendants each participated in this conspiracy by promoting the Infringing Useless to their X followers and insider trading groups.

83.    Their collective conduct constitutes not only a civil conspiracy but also satisfies the elements of a general partnership under law: mutual intent, shared control, division of profits, and joint action toward a common commercial purpose.

## FIRST CLAIM FOR RELIEF
### False Designation of Origin, Likelihood of Confusion, and
### Unfair Competition (15 U.S.C. § 1125(a)(1)(A))

84.    Plaintiffs incorporate by reference the above paragraphs.

85.    Defendants falsely designated the origin of their token by adopting Plaintiffs' USELESS mark, branding, and trade dress, misleading consumers into believing Defendants' token originated with, was affiliated with, or was endorsed by Plaintiffs.

86.    Defendants infringed Plaintiffs' USELESS trademark and associated Logo by using identical or nearly identical branding in commerce in connection with a competing token. Plaintiffs' goods and services travel in the same channels of trade and are offered to the same consumers as Defendants.

87.    As a result of the similarity between Plaintiffs' USELESS trademark and Logo and Defendants' use of USELESS and its identical logo, and the parties' respective goods and services, among other things, Defendants' USELESS Marks and Logo is likely to cause consumer confusion, mistake or deception in the trade and among consumers as to the source, origin, or sponsorship of the respective goods and services.

88.    If Defendants are permitted to continue using the USELESS Mark and Logo in connection with Defendants' goods and services, confusion in trade resulting in irreparable damage and injury to Plaintiffs will continue to be caused by reason of the similarity between Defendants' USELESS Mark and Logo and Plaintiffs' USELESS Mark and Logo. Persons familiar with Plaintiffs' Marks would likely to buy or otherwise invest in Defendants' goods and services believing that such product are provided by, endorsed by, or associated with Plaintiffs, which is not the case. Furthermore, any defect, objection or fault found with Defendants' goods and services marketed under the USELESS Mark and

27

Logo would necessarily reflect upon and seriously injure the reputation which Plaintiff has established for Plaintiffs' goods and services sold under its USELESS Mark and Logo.

89.     These acts constitute unfair competition under the Lanham Act and have diverted sales and goodwill from Plaintiffs.

## SECOND CLAIM FOR RELIEF
### False Advertising (15 U.S.C. § 1125(a)(1)(B))

90.     Plaintiffs incorporate by reference the above paragraphs.

91.     Defendants made knowingly false and misleading statements of fact by advertising the Infringing Useless as legitimate, original, and distinct, despite knowingly copying Plaintiffs' branding and intellectual property. These misrepresentations were material, deceived consumers, influenced purchasing decisions, and caused competitive and reputational harm to Plaintiffs.

## THIRD CLAIM FOR RELIEF
### Cybersquatting (15 U.S.C. § 1125(d))

92.     Plaintiffs incorporate by reference the above paragraphs.

93.     Defendants, with bad-faith intent to profit, registered and used the domain name **theuselesscoin.com**, which is identical or confusingly similar to Plaintiffs' distinctive **USELESS** mark.

94.     Defendants' conduct was intended to divert consumers, trade on Plaintiffs' reputation, and disrupt Plaintiffs' business.

## FOURTH CLAIM FOR RELIEF
### Statutory Unfair Competition (Utah Code § 13-5a-102)

95.     Plaintiffs incorporate by reference the above paragraphs.

96.     Defendants engaged in unfair and deceptive acts and practices, including misappropriation of branding and deceptive marketing, with malicious intent and in knowing disregard of Plaintiffs' rights.

97.     Defendants' conduct violates Utah's Unfair Competition Act.

## FIFTH CLAIM FOR RELIEF
### Common Law Unfair Competition

98.     Plaintiffs incorporate by reference the above paragraphs.

99.     Defendants passed off their token and branding as Plaintiffs', intentionally causing confusion and appropriating Plaintiffs' goodwill.

100.    Defendants' actions constitute unfair competition under common law and have damaged Plaintiffs' reputation and business relationships.

## SIXTH CLAIM FOR RELIEF
### Civil Conspiracy

101.    Plaintiffs incorporate by reference the above paragraphs.

102.    Defendants knowingly agreed and acted in concert to misappropriate Plaintiffs' intellectual property, conceal their infringement, and deceive consumers.

103.    Defendants took overt acts in furtherance of the conspiracy, causing Plaintiffs substantial damages.

## SEVENTH CLAIM FOR RELIEF
### Contributory and Vicarious Infringement

104.    Plaintiffs incorporate by reference the above paragraphs.

105.    Defendants knowingly induced, caused, or materially contributed to trademark infringement by others, and exercised control over infringing activities while benefiting financially from them.

## EIGHTH CLAIM FOR RELIEF
**Unjust Enrichment**

106. Plaintiffs incorporate by reference the above paragraphs.

107. Defendants unjustly profited by exploiting Plaintiffs' trademarks and goodwill without compensation.

108. Retention of those benefits would be inequitable, and restitution is required.

## NINTH CLAIM FOR RELIEF
**Declaratory Judgment (28 U.S.C. §§ 2201–2202)**

109. Plaintiffs incorporate by reference the above paragraphs.

110. An actual and justiciable controversy exists regarding ownership and use of the **USELESS** mark and related intellectual property.

111. Plaintiffs seeks a declaration that (a) Plaintiffs' use of the **USELESS** mark is lawful and non-infringing, and (b) Defendants possess no valid, enforceable rights in the asserted marks, which are invalid, abandoned, or generic.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

(1) Enter judgment in Plaintiffs' favor on all claims;

(2) Declare that Plaintiffs' Useless Crypto, LLC alone owns valid rights in the **USELESS** mark and Logo Artwork and that Defendants' asserted rights are invalid, abandoned, or generic;

30

(3)      Permanently enjoin Defendants from using **USELESS**, the Logo Artwork, or any confusingly similar marks, domains, or social media identifiers;

(4)      Order the transfer of the **theuselesscoin.com** domain name and the **@theuselesscoin** handle (regardless of where it is being used) to Plaintiff Useless Crypto, LLC;

(5)      Award actual damages, statutory damages, treble damages, and punitive damages as permitted by law;

(6)      Award Plaintiffs their attorneys' fees and costs;

(7)      Award Plaintiffs pre- and post-judgment interest; and

(8)      Grant Plaintiffs such other and further legal or equitable relief as the Court deems just and proper.

DATED:  April 30, 2026

Respectfully submitted,

POLSINELLI PC

/s/ *Jose A. Abarca*
Jose A. Abarca
Romaine C. Marshall

QUANTUM LEX PA

*/s/ John Hayden*
John R. Neve (*pro hac vice* forthcoming)
John Hayden (*pro hac vice* forthcoming)

ATTORNEYS FOR PLAINTIFFS